**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LARRY HOUSTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 23 CV 2792** |
| | ) | |
| **v.** | ) | **Judge Jeffrey I. Cummings** |
| | ) | |
| **JP MORGAN CHASE & CO., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Larry Houston brings this case against his bank, JP Morgan Chase Bank, N.A. ("Chase"), Chase's holding company, JP Morgan Chase & Co. ("Chase & Co."), and five Chase employees, Frank Jacobs, Mari Nava, Trent Phillips, Raul Baduel, and Becky Roseland, alleging (1) racial discrimination in violation of Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. 2000d *et seq.* and 42 U.S.C. §1981; (2) violation of the Expedited Funds Availability Act ("EFAA"), 12 U.S.C. §4001 *et seq.*; and (3) sixteen state law claims.

Before the Court are: (1) Baduel and Roseland's motion to dismiss plaintiff's Fourth Amended Complaint for lack of personal jurisdiction, (Dckt. #96); and (2) defendants' motion to dismiss plaintiff's Fourth Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6), (Dckt. #94). After the parties completed their briefing in this matter, plaintiff filed a motion for oral status and for issuance of an order to show cause, (Dckt. #125). For the reasons set forth below, Baduel and Roseland's motion to dismiss is granted. The remaining defendants' motion to dismiss is granted with prejudice with respect to plaintiff's federal claims and denied without prejudice as to plaintiff's state law claims. Finally, plaintiff's motion for an oral status and the issuance of an order to show cause is denied.

## I.     LEGAL STANDARD

The standards governing motions to dismiss under Rules 12(b)(2) and 12(b)(6) are as follows:

Under Rule 12(b)(2), "[t]he plaintiff need not include facts alleging personal jurisdiction in the complaint, but 'once the defendant moves to dismiss the complaint . . . for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating the existence of jurisdiction.'" *Curry v. Revolution Lab'ys, LLC*, 949 F.3d 385, 392 (7th Cir. 2020), *quoting Purdue Research Found. v. Sanofi-Synthelabo, S.A.,* 338 F.3d 773, 782 (7th Cir. 2003). Where, as here, "the Court rules on the motion without a hearing, the plaintiff need only establish a *prima facie* case of personal jurisdiction." *MG Design Assocs., Corp. v. CoStar Realty Info., Inc.*, 267 F.Supp.3d 1000, 1010 (N.D.Ill. 2017). In determining whether plaintiff has made such a showing, the Court will "read the complaint liberally, in its entirety, and with every inference drawn in favor" of the plaintiff. *Cent. States, Se. & Sw. Areas Pension Fund v. Phencorp Reinsurance Co.*, 440 F.3d 870, 878 (7th Cir. 2006) (cleaned up). However, if the "defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Purdue*, 338 F.3d at 783. The Court "will accept as true any facts in the defendants' affidavits that do not conflict with anything in the record," but will resolve any "factual conflict" in favor of the plaintiff. *Curry*, 949 F.3d 385 at 393.

To avoid dismissal under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face," *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and "[p]lausibility requires more than a sheer possibility that a defendant has acted unlawfully." *Walton v. First Merchants Bank*, 772 Fed.Appx. 349, 350 (7th Cir. 2019) (cleaned up). Instead, a claim is

plausible only when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Furthermore, "the complaint must go beyond mere speculation or conjecture and provide factual allegations that allow the court to draw a reasonable inference that [defendants are] liable." *Wertymer v. Walmart, Inc.*, 142 F.4th 491, 495 (7th Cir. 2025).  For example, "[a] complaint is too speculative where there is an 'obvious alternative explanation' for the complaint's factual allegations." *Id.* at 497, *quoting Iqbal*, 556 U.S. at 682.

When considering a motion to dismiss under Rule 12(b)(6), the Court construes "the complaint in the light most favorable to the [non-moving party] accepting as true all well-pleaded facts and drawing reasonable inferences in [the non-moving party's] favor." *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013).  Nonetheless, courts are permitted to consider "any facts set forth in the complaint that undermine the plaintiff's claim." *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013).  Dismissal of an action under Rule 12(b)(6) is "warranted only if no relief could be granted under any set of facts that could be proved consistent with the allegations." *Christensen v. Cnty. of Boone*, 483 F.3d 454, 458 (7th Cir. 2007); *see also Bowes-N v. JPMorgan Chase Bank NA*, No. 3:21-CV-803 JD, 2022 WL 2237146, at *2 (N.D.Ind. June 21, 2022) (dismissal is appropriate "if the allegations fail to raise a claim above the speculative level.") (cleaned up).

## II.   PROCEDURAL BACKROUND

Plaintiff filed his initial complaint and his amended complaint in this matter on May 3, 2023 and June 16, 2023, respectively, naming Chase, Chase & Co., Jacobs, Phillips, "Mari Doe," "Raul Doe," and "Becky Doe," as defendants.  (Dckt. ##1, 5).  Plaintiff later identified the "Doe" defendants and, in August 2023, moved for leave to file a second amended complaint "to replace

3

[] the references to the[m] with their actual names and specif[y] in what capacity they [we]re being sued." (Dckt. ##36 at 2, 38). The court granted plaintiff's motion for leave to file. (Dckt. #40).

Defendants then moved to dismiss the second amended complaint for failure to state a claim, and with respect to defendants Baduel and Roseland, for lack of personal jurisdiction pursuant to Rule 12(b)(2). (Dckt. ##54, 55). Plaintiff did not file an opposition to defendants' motions, and instead, on the day his response was due, submitted a motion for leave to file a third amended complaint which, according to plaintiff, clarified, removed, or more fully presented certain counts based on the arguments raised in defendants' motions. (Dckt. #62). The court granted plaintiff's motion, (Dckt. #64), and shortly thereafter, granted defendants' unopposed motion to extend their deadline to answer or otherwise plead, (Dckt. #66).

After the court extended the briefing schedule, but before defendants' filings were due, this case was re-assigned to this Court. (Dckt. #70). Defendants thereafter timely filed two motions seeking to dismiss plaintiff's third amended complaint, again arguing lack of personal jurisdiction with respect to Baduel and Roseland and failure to state a claim. (Dckt. ##72, 74). Once again, plaintiff did not file an opposition to defendants' motions, and instead, on the day his response was due, filed a motion for leave to file a fourth amended complaint "to clarif[y] counts," and "cure purported or alleged deficiencies cited by [d]efendants." (Dckt. ##78, 85). This Court granted plaintiff's request. (Dckt. #92). "Plaintiff's Corrected Verified Fourth Amended Complaint," (the "Complaint") is the operative complaint in this matter. (Dckt. #90). Defendants move to dismiss the Complaint, once again alleging lack of personal jurisdiction over Baduel and Roseland, and failure to state a claim as to all defendants. (Dckt. ##94, 96).

After the parties completed their briefing on defendants' motions to dismiss, plaintiff filed a motion seeking a status and oral argument on his motion to dismiss, as well as a briefing schedule on a rule to show cause based on plaintiff's argument that defendants frauded this Court by attaching the wrong version of certain agreements to their motion to dismiss. (Dckt. #125).

## III. FACTS ALLEGED IN THE COMPLAINT

Plaintiff is an African-American male who works as an entrepreneur, gig worker, sole proprietor, and independent contractor and earns income from transportation and entertainment services in the Chicago area. (Dckt. #90 ¶1). Plaintiff entered into a banking relationship with Chase in 2014 and he signed a Deposit Account Agreement ("DAA") and signature card upon the initiation of his account. (*Id.* ¶¶26, 129).

During the COVID-19 pandemic, plaintiff applied for financial assistance from the federal government to mitigate the negative economic effects that the pandemic was having on his businesses. (*Id.* ¶29). Between June 25, 2020 and February 23, 2022, plaintiff received five disbursements of grant and COVID-19 Economic Injury Disaster Loan ("EIDL") funds from the U.S. Small Business Administration ("SBA") in the total amount of $36,000. (*Id.* ¶31). The SBA, which does not require persons who receive SBA funds to have a business account, deposited these funds into plaintiff's personal bank account at Chase. (*Id.* ¶¶30–31).

Between February 2021 and March 2022, plaintiff successfully withdrew funds (including grant and loan funds he received from the SBA) in the  amount of $77,000 from his Chase personal checking account at Chase branches in the Chicago area. (*Id.*). Specifically, plaintiff withdrew the following amounts on the following dates:

- $10,000 on February 17, 2021;
- $10,000 on March 1, 2021;
- $4,000 on August 19, 2021;
- $14,000 on October 5, 2021;

- $24,000 on November 6, 2021; and
- $15,000 on March 2, 2022.

(*Id.*).  None of these withdrawals corresponded to the dates that plaintiff received deposits of

SBA grant and loan funds into his Chase personal checking account.  (*Id.*).

The March 20, 2022 version of the DAA that was in effect during the time pertinent to

this lawsuit (namely, in and around May 2022) provides in pertinent part as follows:

### C.     Restricting Your Account; Blocking or Delaying Transactions

There are many reasons we may decline or prevent transactions to or from your account, but we generally do it to protect you or us, or to comply with legal requirements.  We may decline or prevent any or all transactions to or from your account.  We may refuse, freeze, reverse or delay any specific withdrawal, payment or transfer of funds to or from your account, or we may remove funds from your account to hold them pending investigation, including in one or more of the following circumstances.

.        .        .

*We suspect that any transaction may involve illegal activity or may be fraudulent;

*We are complying in our sole judgment, with any federal, state or local law, rule or regulation, including federal asset control and sanction rules and anti-money-laundering rules, or with our policies adopted to assure that we comply with those laws, rules or regulations; or

*We reasonably believe that doing so is necessary to avoid a loss or reduce risk to us.

(Dckt. #95-1 at 26).[1]  The DAA further provides that "[i]f this agreement conflicts with any

statements made by one of our employees or by our affiliates' employees, this agreement will

---

[1] Defendants attached the DAA as an exhibit to their memorandum in support of their motion to dismiss. Plaintiff asserts that defendants' submission of the DAA for consideration requires the Court to convert defendants' motion to dismiss into a motion for summary judgment.  Not so.  It is well-settled that the Court is entitled to consider facts within documents that are referenced in the pleadings if they are central to a plaintiff's claim on a motion to dismiss.  *See, e.g.*, *Esco v. City of Chicago*, 107 F.4th 673, 678 (7th Cir. 2024); *Bogie*, 705 F.3d at 609.  Here, plaintiff references his DAA in the Complaint and the DAA is the contract between plaintiff and Chase, (*see* Dckt. #95-1 at 5); as such, the DAA is central to plaintiff's claims in this case.  *See, e.g.*, *Gaskin v. BMO Harris Bank NA*, No. CV-23-01919-PHX-SMB, 2024 WL 1961843, at *4 n.1 (D.Ariz. May 3, 2024) (considering plaintiff's deposit agreement on a motion to dismiss her EFAA and Section 1981 claims).  Furthermore, the fact that defendants, rather than plaintiff,

govern," and that "[w]e (Chase) may change the terms of this agreement, including fees and features of your account, at any time." (*Id.*).

On May 4, 2022, the SBA deposited an additional $37,000 into plaintiff's Chase personal checking account and plaintiff attempted to withdraw the entire $37,000 deposit later that same day from a Chase branch in Chicago, Illinois. (Dckt. 90 ¶¶32–33). It is the events that transpired during and after plaintiff's May 4, 2022 visit to Chase that give rise to this lawsuit. (*Id.* ¶¶33–142).

When plaintiff arrived at the Chase Belmont Branch on May 4, 2022, he was greeted by the branch manager (defendant Frank Jacobs) who asked him the purpose of his visit. (*Id.* ¶¶33–34). Plaintiff stated that he wanted to withdraw funds from his account and Jacobs directed plaintiff to defendant Mari Nava (who was one of the tellers on duty). (*Id.* ¶¶34–35). After Nava provided plaintiff with his account balance (which consisted of the $37,000 in SBA funds plus his personal funds in the amount of $320.19), plaintiff requested to withdraw the $37,000 that the SBA had deposited into his personal checking account earlier that day via a money order. (*Id.* ¶¶36–37). Nava informed him that the requested amount was too large for a money order, and explained that the bank could instead issue a cashier's check to withdraw the $37,000. (*Id.* ¶38). When Nava tried to complete the transaction, however, she ran into an unspecified issue which required her to obtain approval from Jacobs, the branch manager. (*Id.* ¶40).

After speaking with Nava privately, Jacobs approached plaintiff in the bank lobby and—within earshot of others—questioned plaintiff regarding his identity, occupation, and intentions at the bank. (*Id.* ¶41). After plaintiff answered Jacobs' questions and offered to present his 2018–19 tax returns, 1099s, and IRS Form 4506 to prove the legitimacy of his loan, Jacobs

submitted the DAA for the Court's consideration is of no moment. *See, e.g.*, *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012).

expressed his view that plaintiff's explanation made no sense and that "no legitimate sole proprietor would ever put a business loan in a personal account." (*Id.* ¶¶43–46). Plaintiff expressed his discomfort with continuing the conversation in the public area of the bank, told Jacobs that his accusations appeared discriminatory, and threatened to report him to Chase's Executive Offices. (*Id.* ¶¶48–50). Jacobs then told plaintiff that he needed to make a phone call and left plaintiff for a few minutes in the lobby. (*Id.* ¶¶51, 56). During his conversation with Jacobs, and while he was waiting for Jacobs to return from his phone call, plaintiff noticed that other non-African-American Chase customers were discussing their matters in the privacy of an office or a cubicle, and he observed a non-African-American Chase customer withdraw $3,000 in cash without incident. (*Id.* ¶42).

When Jacobs returned, he informed plaintiff that he spoke with Chase's internal team and explained that Chase required plaintiff's 2021–22 tax returns, 1099s, Form 4506, and proof of identity to access the $37,000. (*Id.* ¶57). Plaintiff asserted that his 2021–22 tax returns were irrelevant because the funds were obtained pursuant to his 2018–19 tax returns and he offered again to provide those tax documents electronically. (*Id.* ¶59). Plaintiff and Jacobs continued to disagree as to which years' tax documents would suffice for the bank's purposes and plaintiff informed Jacobs that he could not go home to retrieve the 2021–22 tax documents before the bank branch closed. (*Id.* ¶¶59–67). After Jacobs told plaintiff that the bank would not grant his withdrawal request, plaintiff again asserted that he was being discriminated against and he requested Jacobs' name and the phone number to the Chase "internal team" that Jacobs had contacted. (*Id.* ¶¶68–69). Jacobs wrote his name down for plaintiff, along with the number for the "internal team," which plaintiff accepted before leaving the bank. (*Id.* ¶70).

8

Once he was back in his car, plaintiff called the number Jacobs provided, which directed him to Chase's Fraud Center and, ultimately, connected him to defendant Becky Roseland. (*Id.* at ¶¶74–75). Plaintiff told Roseland about his interaction with Jacobs, and Roseland responded by telling plaintiff that he needed to visit a Chase branch in person with "the documents requested," and that Chase would not accept documents by email. (*Id.* ¶¶76, 79). Roseland then hung up on plaintiff while he was still speaking. (*Id.* ¶80). Plaintiff redialed the Chase Fraud Center and was connected with a representative named Michelle. (*Id.* ¶81). Michelle, who was conciliatory and apologetic, advised plaintiff that if he did not turn in his documents to Chase, Chase would return the funds and close all his Chase accounts. (*Id.* ¶¶81–85). Michelle further stated that the bank would hold the money temporarily and that plaintiff should bring his paperwork to a different branch the next day (May 5, 2022) to obtain the release of his SBA funds that were "frozen" as a result of the call that Jacobs had made to the Chase Fraud Center earlier that day. (*Id.* ¶86).

Later, during the evening of May 4, 2022, plaintiff checked his back account and saw a balance of $37,320.19. (*Id.* ¶87). However, when plaintiff checked his Chase personal checking account the following morning (May 5, 2022), he learned that Chase had zeroed out his account by removing all of his funds including the $37,000 from the SBA and his $320.19 in personal funds. (*Id.* ¶90). Plaintiff then drove to a Chase branch in Aurora, Illinois where he spoke with its branch manager, defendant Trent Phillips, and provided his 2018–19 tax returns and some of the other documentation requested by Jacobs the prior day. (*Id.* ¶¶91–94). Phillips called the Chase Fraud Center, worked with the Fraud Center to obtain the release of the funds, and learned that the Fraud Center had approved the SBA loan funds and recredited all loan and personal funds to plaintiff's account. (*Id.* ¶¶95–98). After plaintiff noted that he could not see any funds

on his Chase mobile app, Phillips informed him that it would take twenty-four to forty-eight hours for the funds to be available to him. (*Id.* ¶¶99–100).

On May 6, 2022, before the forty-eight hours elapsed, plaintiff checked his account and did not see the funds, so he contacted the Chase Fraud Center again. (*Id.* ¶101). During that call, a Chase representative informed plaintiff that Chase returned the funds to the SBA on May 5, 2022 due to a "freeze" on his account. (*Id.* ¶102). A few days later, on May 9, 2022, plaintiff lodged a telephonic complaint against Chase with the Consumer Financial Protection Bureau ("CFPB"). (*Id.* ¶108).[2]

On or about May 12, 2022, Chase informed plaintiff that he would need to have the SBA funds re-sent to his Chase account. (*Id.* ¶109). On May 13, 2022, Plaintiff learned that although the SBA attempted to recredit the funds to plaintiff's personal checking on May 12, 2022, Chase rejected the funds because the account was "frozen." (*Id.* ¶111). Two days later, on May 14, plaintiff submitted information to the SBA seeking to have the loan deposited into his personal account at Wintrust Community Bank. (*Id.* ¶115). Due to logistical issues on the SBA's end, the SBA funds were not deposited into plaintiff's Wintrust account until September 16, 2022. (*Id.* ¶128). Plaintiff alleges that Chase's actions delayed his ability to withdraw his SBA funds, and

---

[2] On May 23, 2022, defendant Raul Baduel responded to the CFPB complaint on Chase's behalf and informed plaintiff that there was no error on Chase's part and that Chase's employees had followed proper protocol when handling plaintiff's SBA loan. (*Id.* ¶118). The CFPB closed plaintiff's complaint after it received Chase's response from Baduel. (*Id.* ¶119). On June 15, 2022, plaintiff filed a second CFPB complaint, this time against Chase and Baduel, based on his belief that they had provided false information to the government when Baduel reported that Chase returned plaintiff's SBA loan on May 4, 2022, because another Chase representative told plaintiff at a different time that the funds were returned on May 5, 2022. (*Id.* ¶¶120–122). Baduel responded to the second CFPB complaint by stating that Chase "restricted" plaintiff's account because plaintiff did not make his prior withdrawals immediately after the funds were deposited into his account (as he attempted to do on May 4) and plaintiff did not have documentation to support his business operation at the time of his May 4 visit to the Belmont branch. (*Id.* ¶126). The Complaint does not reflect the disposition of the second CFPB complaint.

as a result, he had to cease operations of his trucking business, place certain music projects on hold, "discontinue[] his ride-sharing business," and seek mental health counseling. (*Id.* at 2–3).

## IV.    DISCUSSION

Before the Court are: (1) Baduel and Roseland's motion to dismiss for lack of personal jurisdiction; and (2) defendants' motion to dismiss pursuant to Rule 12(b)(6). The Court addresses these motions in turn below.

### A.    This Court Does Not Have Personal Jurisdiction Over Baduel and Roseland.

In support of their motions to dismiss, Baduel and Roseland both submitted a declaration asserting that they are citizens of Texas, (Dckt. ##97-1 at 2, 97-2 at 2), and, on that basis, contend that this Court lacks personal jurisdiction over them. Where, as here, defendants argue that the court lacks jurisdiction over them, plaintiff bears the burden of establishing that personal jurisdiction exists. *Advanced Tactical Ordnance Systems, LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 799 (7th Cir. 2014); *uBID, Inc. v. GoDaddy Group, Inc.*, 623 F.3d 421, 423–24 (7th Cir. 2010).

A plaintiff may demonstrate personal jurisdiction over a defendant through either general or specific jurisdiction. *See Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Hous. Metroplex, P.A.*, 623 F.3d 440, 444 (7th Cir. 2010). Here, plaintiff relies only on the latter, (*see* Dckt. #104 at 2–3), thereby waiving any arguments with respect to general jurisdiction, *see, e.g.*, *Sroga v. Rendered Servs. Inc.*, No. 19-CV-2299, 2019 WL 6173424, at *1 (N.D.Ill. Nov. 20, 2019) ("It is a longstanding rule that a plaintiff waives his claims when he fails to develop arguments or fails to respond to alleged deficiencies in a motion to dismiss.") (citing *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011)).

11

Specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). Three essential requirements must be met. *See NBA Properties, Inc. v. HANWJH*, 46 F.4th 614, 623 (7th Cir. 2022). First, the defendant's "contacts with the forum state must show that [they] purposefully availed itself of the privilege of conducting business in the forum state or purposefully directed its activities at the state." *Id.*, *quoting Curry*, 949 F.3d at 398 (cleaned up). Second, "the plaintiff's alleged injury must have arisen out of the defendant's forum-related activities." *Id.*, *quoting Curry*, 949 F.3d at 398. And third, "any exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice." *Id.*, *quoting Curry*, 949 F.3d at 398. "For a State to exercise jurisdiction consistent with due process, the defendant's *suit-related* conduct must create a substantial connection with the forum State." *Advanced Tactical Ordnance Sys.*, 751 F.3d at 801, *quoting Walden v. Fiore*, 571 U.S. 277, 284 (2014). The relationship between [the defendant] and the forum state must also "arise out of contacts that the defendant *[themselves]* create[] with the forum . . . ." *Id.* (cleaned up).

Plaintiff urges this Court to find that Baduel and Roseland are subject to specific personal jurisdiction in Illinois based on *Calder v. Jones*, 465 U.S. 783 (1984). In *Calder*, the Supreme Court held that a California court could exercise personal jurisdiction over Florida defendants who wrote and edited an allegedly defamatory article about a California entertainer published in a national magazine because defendants' conduct was "expressly aimed at California." *Id.* at 789. Relying on *Calder*, plaintiff contends that Baduel and Roseland's conduct was expressly aimed at Illinois because "Def. CHASE purposely and intentionally availed Def. Baduel to an Illinois investigation to investigate and provide answers to both the Plaintiff, and Illinois

12

resident, and the US Government on behalf of Def. CHASE," and "in Def. Roseland['s] capacity as a Fraud Specialist IV, Def. CHASE avails Def. Roseland to all US States where it operates business to _resolve_ its corporation and customer issues for Criminal and Fraudulent Banking Issues." (Dckt. #104 at 5, 7) (emphasis in original).

In other words, plaintiff contends that because Chase allegedly directed Baduel and Roseland to an Illinois citizen and/or an Illinois investigation, Baduel and Roseland themselves directed their activities to Illinois. This argument misses the mark. Over a decade ago the Supreme Court, in *Walden*, refined the *Calder* test, clarifying that "[t]he proper question is not where the plaintiff experienced a particular injury or effect but *whether the defendant's conduct connects him to the forum in a meaningful way*." 571 U.S. at 290. The *Walden* court further confirmed that a "defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Id.* at 286 (citing *Rush v. Savchuck*, 444 U.S. 320, 332 (1980)). Nonetheless, plaintiff argues that it is the relationship between himself and Baduel and Roseland (and *not* the relationship between Baduel and Roseland and the forum state (Illinois)) that gives rise to specific personal jurisdiction. Given *Walden*, the Court rejects plaintiff's argument and finds that plaintiff has not alleged conduct by Baduel or Roseland that connects them to the *forum* in any meaningful way. *Walden*, 571 U.S. at 290; *Advanced Tactical Ordnance Sys.,* 751 F.3d at 802 ("plaintiff cannot be the only link between the defendant and the forum.") (cleaned up); *Johnson v. Melton Truck Lines, Inc.*, No. 14 C 07858, 2016 WL 8711494, at *3–4 (N.D.Ill. Sept. 30, 2016) (same).

Furthermore, even if federal due process would permit this Court's exercise of personal jurisdiction over Baduel and Roseland, the fiduciary shield doctrine—which Illinois has adopted—would preclude it. *See, e.g.*, *Fletcher v. Doig*, 125 F.Supp.3d 697, 716 (N.D.Ill. 2014).

In particular, "the fiduciary shield doctrine 'denies personal jurisdiction over an individual whose presence and activity in the state in which the suit is brought were solely on behalf of his employer or other principal.'" *Id.*, *quoting Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 912 (7th Cir. 1994); *see also ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 550 (7th Cir. 2001) ("Illinois employs the fiduciary-shield doctrine, . . . under which a person who enters the state solely as fiduciary for another may not be sued in Illinois.") (cleaned up). The fiduciary shield doctrine applies here because the Complaint alleges that Baduel and Roseland spoke with plaintiff solely in their capacity as Chase employees regarding plaintiff's inability to withdraw funds from his personal checking account. (Dckt. #90 ¶¶6–7, 75, 118, 123–24).

For these reasons, Baduel and Roseland's motion to dismiss for lack of personal jurisdiction is granted.

### B.    Plaintiff's Federal Claims Against the Remaining Defendants are Dismissed with Prejudice.

The remaining defendants—Chase, Chase & Co., Nava, Jacobs, and Phillips—argue that plaintiff's federal and state claims against them must be dismissed pursuant to Rule 12(b)(6). Given that the Court's jurisdiction over plaintiff's state law claims against defendants hinges on the viability of his federal claims, the Court begins with plaintiff's federal claims. For the reasons set forth below, the Court finds that plaintiff has failed to sufficiently allege his federal claims against defendants to survive a motion to dismiss and it relinquishes jurisdiction over his state-law claims in accordance with Seventh Circuit guidance.

1.    **Plaintiff Fails to Adequately Allege That Defendants Intentionally Discriminated Against Him Based on His Race in Violation of Section 1981 and Title VI.**

Plaintiff alleges that he was subjected to racial discrimination in violation of Section 1981 and Title VI.[3]  To state a claim under both statutes, plaintiff must adequately plead that but-for race, he would not have suffered the loss of a legally protected right.  *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020) (To prevail under Section 1981, "a plaintiff must initially plead and ultimately prove that, but for race, [he] would not have suffered the loss of a legally protected right."); *Mir v. State Farm Mut. Auto. Ins. Co.*, 847 Fed.Appx. 347, 350 (7th Cir. 2021) (same); *Students for Fair Admissions, Inc.*, 600 U.S. 181, 289 (2023) (Gorsuch, J., concurring) ("because of" in Title VI invokes "but-for causation"); *Murguia v. Childers*, 81 F.4th 770, 775 (8th Cir. 2023) (same).  Consequently, "[t]he standard for establishing an 'intent to discriminate on the basis of race' is identical in the Title VI and §1981 contexts." *Pryor v. Nat'l Collegiate Athletic Ass'n.*, 288 F.3d 548, 569 (3d Cir. 2002).[4]

Allegations that defendants' actions were purposefully discriminatory and racially motivated are essential to allege a claim under Section 1981 and Title VI.  *See, e.g., Dames v. JP*

---

[3] Section 1981 guarantees all persons "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens. . . ." 42 U.S.C. §1981.  Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 42 U.S.C. §2000d.

[4] Plaintiff cites to the decision in *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 656 (2020), to support his assertion that there can be multiple "but for" causes.  (Dckt. #107 at 29–30 (citing *Bostock*). However, the Supreme Court "in *Bostock* was clear on the narrow reach of its decision and how it was limited only to Title VII itself." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021).  As such, *Bostock* is inapposite because "[t]he pleading standards for Title VII race discrimination claims and Section 1981 claims are not identical." *Hill v. Target Corp.*, No. 24 C 341, 2025 WL 3034033, at *4 n.6 (N.D.Ill. Oct. 30, 2025).  This is so because the "motivating-factor causation standard located in Title VII is distinct from, and 'more forgiving' than, a but-for standard, as 'liability can sometimes follow even if [a protected trait] *wasn't* a but-for cause of the employer's challenged decision.'" *Akridge v. Alfa Ins. Cos.*, 93 F.4th 1181, 1192 (11th Cir. 2024), *quoting Bostock*, 590 U.S. at 657 (emphasis added in *Bostock*).

*Morgan Chase & Co.*, No. 22CV6962NGGSJB, 2023 WL 5047776, at *3 (E.D.N.Y. Aug. 8, 2023). As such, "conclusory and naked allegations" of discrimination are insufficient; instead, "fact-specific allegations of a causal link between the defendant's actions and the plaintiff's race are required." *Akyar v. TD Bank US Holding Co.*, No. 18-CV-379 (VSB), 2018 WL 4356734, at *3 (S.D.N.Y. Sept. 12, 2018) (cleaned up). "Discriminatory intent may be alleged explicitly via direct evidence, or implicitly by way of circumstantial evidence that supports an inference of discrimination." *Id.* (cleaned up); *Dames*, 2023 WL 5047776, at *3.

### i. Plaintiff does not allege any direct evidence that allows a plausible inference that defendants discriminated against him based on his race.

"Direct evidence of discriminatory intent must include racial undertones, remarks or actions that might give rise to a plausible inference of discrimination." *Michell v. McDonald's Corp.*, No. 24-CV-3442 (NGG) (PK), 2025 WL 2711951, at *19 (E.D.N.Y. Sept. 23, 2025) (cleaned up). Examples of such direct evidence include racial slurs, cursing a plaintiff out with reference to his race, inquiries into a plaintiff's country of origin, comments such as "we don't want money from your type," and other stereotypical comments (such as statements about blacks being on welfare or belonging in the cotton field). *Id.*; *Dames*, 2023 WL 5047776, at *3; *Stephens v. Degeatano Enterprises Inc.*, No. 23-cv-2058, 2025 WL 2390507, at *5 (N.D.Ill. Aug. 18, 2025).[5] Plaintiff does not allege any such direct evidence in the Complaint.

Instead, plaintiff relies on his allegations that he was treated in a rude and unprofessional manner in a public area of the bank by Jacobs and on the phone by Roseland (who hung up on

---

[5] Allegations that a defendant took abrupt and negative action toward a plaintiff shortly after learning of the plaintiff's race can also suffice to plead discriminatory intent. *See, e.g.*, *Lindsay v. Yates*, 498 F.3d 434, 439–40 (6th Cir. 2007) (holding that plaintiffs-purchasers properly pleaded a Section 1981 claim by alleging that (1) sellers advertised their house for sale; (2) plaintiffs signed a purchase agreement and made a deposit; and (3) sellers terminated the contract three weeks after signing agreement and one day after agent learned plaintiffs were black).

him), and how defendants' conduct made him feel like he was being accused of fraud when he was reported to the Chase Fraud Center. This Court can understand how defendants' alleged conduct was upsetting and led plaintiff to develop the subjective understanding that he was being discriminated against. However, courts have held that a defendant's rude and unprofessional conduct towards a plaintiff without any racial undertones or link to plaintiff's race does not allow the plausible inference that the defendant engaged in this conduct towards the plaintiff *because* of his race. *See, e.g.*, *Georgalis v. State Fair of Texas*, No. 3:23-CV-1682-B, 2024 WL 4647718, at *7 (N.D.Tex. Oct. 31, 2024) (While defendant's treatment "may demonstrate rude and unprofessional behavior on [defendant's] part, they do not indicate that [defendant] disliked Georgalis *because* he was Greek."); *Pullins v. Hancock Whitney Bank*, 512 F.Supp.3d 647, 659 (M.D.La. 2021).

Similarly, even wrongful accusations of theft or fraud do not create a plausible inference of racial discrimination where the plaintiff's "complaint was 'devoid of any factual allegations that state that [he] was called names, racial epithets, mistreatment due to racial origin, [or] harassment due to racial origin.'" *Rivera v. Costco Wholesale Corp.,* No. CV 23-01321 (MAJ), 2024 WL 2846352, at *4 (D.P.R. June 5, 2024), *quoting Ortiz-Rosario v. Toys "R" Us Puerto Rico, Inc.*, 585 F.Supp.2d 216, 227 (D.P.R. 2007) ("While the Court sympathized with the plaintiff's experience and found it 'deplorable' that she was wrongfully accused of theft, it ultimately found that it was only *conceivable* and not *plausible* that she was accused *only* because she was a black woman, based off of her allegations.") (emphasis in original). Furthermore, a plaintiff's genuine subjective belief that he is being discriminated against is insufficient to state a Section 1981 claim in the absence of allegations that permit a plausible

inference of racial discrimination. *See, e.g.*, *Spann v. JPMorgan Chase Bank, N.A.*, No. CV 21-1643, 2022 WL 2177438, at *7 (E.D.La. June 16, 2022) (citing cases).

>      ii.    **Plaintiff has failed to plausibly allege that similarly situated non-African-American bank customers received more favorable treatment**.

It is well-settled that an inference of discrimination can be drawn from allegations that similarly situated individuals who are not members of the relevant protected class received more favorable treatment than the plaintiff. *See, e.g.*, *Michell*, 2025 WL 2711951, at *18, 21; *Carter v. Dillard's Inc.*, No. CV 24-510-SDD-SDJ, 2025 WL 790306, at *4 (M.D.La. Mar. 12, 2025); *Dames*, 2023 WL 5047776, at *3. The "plaintiff bears the burden to plausibly allege that [] persons of a different race who were 'allegedly afforded preferential treatment' are similarly situated in all material respects." *Michell*, 2025 WL 2711951, at *21, *quoting Myers v. Doherty*, No. 21-3012-CV, 2022 WL 4477050, at *2 (2d Cir. Sept. 27, 2022); *Rivera*, 2024 WL 2846352, at *4.[6]

Plaintiff here alleges that there were non-African-American Chase customers who were similarly situated to him. In particular, plaintiff cites to his observation that a non-African-American customer who was allowed to withdraw $3,000 in cash without interrogation while he was in the bank attempting to make his withdrawal from his account. (Dckt. #90 ¶42). Contrary to plaintiff's assertion, (Dckt. #107 at 25), this allegation is insufficient to create a plausible inference that the customer was similarly situated to plaintiff. To begin, there is an obvious factual difference between this customer's withdrawal of $3,000 in cash and plaintiff's effort to

---

[6] The *Rivera* court cited cases where plaintiffs successfully alleged discriminatory intent by pointing to more favorable treatment for similarly situated others by, for example, alleging that costumed performers appearing as Sesame Street characters ignored plaintiffs' children while interacting with white customers and their children who were present at the time. *Id.* (citing *Burns v. SeaWorld Parks & Ent., Inc.*, 675 F.supp.3d 532, 537 (E.D.Pa. 2023)).

withdraw $37,000 from his account via a money order.  Indeed, the Complaint alleges that

plaintiff himself successfully withdrew amounts ranging from $4,000 to $24,000 from his Chase

account prior to the incident that is the subject of this lawsuit.  Furthermore, plaintiff has failed

to allege details necessary to determine whether this customer was similarly situated to him, such

as the nature of the account (i.e., business or personal) from which the other customer made his

withdrawal; the source of the funds he withdrew (i.e., were they SBA loan funds); and whether

the funds the customer withdrew were deposited earlier that same day or on some other prior

date.  *See, e.g.*, *Akyar*, 2018 WL 4356734, at *4 (rejecting allegation that other customers were

similarly situated to plaintiff where the complaint did not contain sufficient details about how the

comparators utilized their bank accounts, how long they held them, and whether they were

associated with a political group or were under investigation by the federal government).

Next, plaintiff's assertion that non-African-American customers who were discussing

their bank issues in the privacy of an office or cubicle (as opposed to in the public area of the

bank) were similarly situated to him fares no better.  (Dckt. #90 ¶¶42, 55).  Again, plaintiff does

not allege the nature of the services that the other customers sought from the bank, whether they

attempted to withdraw funds, and (if so), whether they were successful.  *See Spann*, 2022 WL

2177438, at *7 (rejecting plaintiff's assertion that other customers were similarly situated as

"conclusory and speculative" where plaintiff failed to identify a single customer who was

permitted to engage in the same type of transaction that the bank refused to allow him to

effectuate); *Pullins*, 512 F.Supp.3d at 659–60 (rejecting assertion that other customers were

similarly situated to plaintiff where plaintiff made "no allegations regarding the nature of the

services sought by the allegedly similarly situated non-minority customers" and therefore failed

to allege that they sought the same services as him); *Carter*, 2025 WL 790306, at *4 ("an

19

allegation that non-minority customers sought the *same services* . . . and received different treatment/results would allow an inference of race discrimination.") (emphasis added). Furthermore, his allegation that the other customers were conducting bank transactions in the private cubicles is based on his "unsubstantiated suppositions." *See Coleman v. JPMorgan Chase Bank, NA*, No. 317CV00741GNSCHL, 2018 WL 6183285, at *4 (W.D.Ky. Nov. 27, 2018) (allegations that others are similarly situated to plaintiff "must be supported by something other than the plaintiff's unsubstantiated suppositions.").

For these reasons, plaintiff has failed to plausibly allege that these customers were similarly situated to him.

### iii. Plaintiff's remaining allegations fail to raise a plausible inference of intentional race discrimination.

Plaintiff raises two other allegations which he asserts permit an inference of intentional race discrimination. First, he alleges that defendant Jacobs, on information and belief, disproportionately reports African-Americans to the Chase Fraud Center. (Dckt. #90 ¶138). However, this conclusory allegation does not create a plausible inference of intentional race discrimination because plaintiffs "cannot simply assert that [a challenged practice] has a disproportionate effect on certain minorities" to recover under Title VI or Section 1981. *See, e.g.*, *Pryor*, 288 F.3d 548 at 562; *Jackson v. N. Illinois Univ. Coll. of L.*, No. 10 C 01994, 2010 WL 4928880, at *2 (N.D.Ill. Nov. 30, 2010) (allegations that plaintiff was a black woman and defendant has a low percentage of black women and students in its JD program did not support an inference of Title VI race discrimination).

Next, plaintiff asserts that his race discrimination claims should not be dismissed because defendants have failed to articulate "a truthful, factual, non-discriminatory, and/or legitimate reason for [their] actions taken against the Pltf. on May 4, 2022 and thereafter." (Dckt. #107 at

22 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Not so. "In assessing a §1981 claim at the pleading stage, 'the court does not apply the familiar *McDonnell Douglas* burden shifting test used to analyze the evidentiary support for discrimination claims, but rather generally assesses the plausibility of the plaintiff's claim based on the facts alleged.'" *Dames*, 2023 WL 5047776, at *3, *quoting McDowell v. North Shore-Long Island Jewish Health Sys., Inc.,*, 788 F.Supp.2d 78, 81 (E.D.N.Y. 2011); *see also Pullins*, 512 F.Supp.3d at 659 ("Plaintiff bemoans the fact that Defendant has not offered an explanation for the 'inconsistencies with regard to the aforementioned false reason provided to Plaintiff'; however, at the Rule 12(b)(6) stage, Defendant does not have this burden.").

### iv. Plaintiff has pled an obvious alternative explanation other than racial animus for defendants' actions.

As stated above, the Seventh Circuit has recognized that "[a] complaint is too speculative where there is an 'obvious alternative explanation' for the complaint's factual allegations." *Wertymer*, 142 F.4th at 497, *quoting Iqbal*, 556 U.S. at 682. Several courts have applied this principle in the context of intentional race discrimination claims and held that a plaintiff's attempt to meet his burden of pleading "but-for" causation is undermined where the complaint provides an alternative explanation other than racial animus for defendants' conduct. *See, e.g.*, *Dames*, 2023 WL 5047776, at *1, 4 (finding plaintiff failed to plead but-for causation where the complaint alleged the check he attempted to cash was held for fraud, noting that the "unrefuted alternative explanation further undercuts a finding of intent"); *Akyar*, 2018 WL 4356734, at *5 (dismissing Section 1981 claim where the complaint "provide[d] a clear motive for the termination of [p]laintiff's accounts that d[id] not turn on racial animus," noting "[a] complaint that identifies other possible motives . . . for a defendant's action and that does not contain specific facts suggesting discriminatory animus contradicts a claim of racial or ethnic

discrimination.") (cleaned up); *Bowes-N.*, 2022 WL 2237146, at *6 (finding that a complaint did not plead but-for causation where "logical proposition that a bank would request identification before processing a large cash withdrawal" was a "competing, obvious, alternative explanations which diminish[ed] the plausibility of [plaintiff's] alleged version of events."); *Coleman*, 2018 WL 6183285, at *4 (dismissing Section 1981 claim where plaintiff's allegations established that Chase had stated concerns of fraud, holding that "Chase's actions were proportionate to its stated interest to protect itself and its customers"); *Korova Milk Bar of White Plains, Inc. v. PRE Props., LLC*, No. 11 CIV 3327 ER, 2013 WL 417406, at *9 (S.D.N.Y. Feb. 4, 2013) ("a complaint that sets forth other possible motives for the alleged conduct, and does not contain specific facts supporting a claim of racial animus, contradicts a claim of race discrimination.") (cleaned up).

Similarly here, the Complaint sets out an alternative explanation for Chase's treatment of plaintiff's account—namely, that plaintiff tried to withdraw by money order a $37,000 deposit of SBA loan funds on the same day that the SBA deposited the funds into his personal account. According to the Complaint, plaintiff had previously received and withdrew SBA loan and grant funds from his personal account, but he had never made a withdrawal on the same day that the SBA deposited funds into his account. (Dckt. #90 ¶¶31, 126). Nor had plaintiff attempted to withdraw a sum as large as $37,000 before. (*Id.*).[7] Moreover, plaintiff refused to provide the tax-related documentation that Chase requested and insisted that the more dated tax information that he was willing to provide should suffice. The DAA provided Chase with the authority to freeze plaintiff's account pending investigation under such circumstances. (Dckt. #95-1 at 26);

---

[7] The fact that plaintiff attempted to withdraw $37,000 by money order is itself unusual because the maximum value of money orders is typically capped at $1,000. *See United States v. Thomas*, 313 Fed.Appx. 280, 282 n.1 (11th Cir. 2009) (noting that postal money orders had a maximum face value of $1,000).

*see Gaskin*, 2024 WL 1961843, at *4. In the absence of any other allegations indicating racial animus, it is simply not plausible to infer that defendants would have acted differently when presented with plaintiff's May 4, 2022 requested withdrawal but-for his race. *See, e.g.*, *Coleman*, 2018 WL 6183285, at *4 ("Given the absence of any plausible factual allegations supporting an inference of discrimination, Chase's explanation simply illustrates the unreasonableness of the inference sought and the implausibility of the claims made.") (cleaned up).

In sum: for all of the above reasons, the Court finds that plaintiff's Section 1981 and Title VI claims must be dismissed because he has failed to plausibly allege that defendants intentionally discriminated against his based on his race.

### 2.      Plaintiff Has Failed to Plead a Claim Under the EFAA.

The EFAA "standardize[s] the hold periods on deposits made to commercial banks and regulates deposit holds." *DriverDo LLC v. JP Morgan Chase Bank, N.A.*, No. 20 C 5046, 2021 WL 3487331, at *3 (N.D.Ill. Aug. 9, 2021). Relevant here, "no deposit may be withheld indefinitely, and the first $200 of any deposit must be available to the depositor the next business day." *Khor Chin Lim v. BMO Fin. Grp.*, 497 Fed.Appx. 621, 624 (7th Cir. 2012) (cleaned up); *see also* 12 U.S.C. §4002(a)(2)(D).

Plaintiff alleges that Chase and Chase & Co. violated the EFAA when they failed to make $200 of the $37,000 SBA loan available to him the day after it was deposited. (Dckt. #90 ¶154). Even assuming, without deciding, that Chase & Co., as a holding company, is considered a depository institution that is subject to the requirements of the EFAA—and Chase & Co. argues that it is not—plaintiff's EFAA claim still fails. This is so, as multiple courts have held, because "placing a hold on or freezing funds in an account after the deposits have been made available is

not a violation of the [EFAA] and thus does not support a claim for civil liability . . ." *Little Donkey Enters. Wash., Inc. v. Bancorp*, 136 Fed.Appx. 91, 92 (9th Cir. 2005); *DriverDo LLC*, 2021 WL 3487331, at *4 ("placing a hold on or freezing an account after deposits have been made does not violate the EFAA"); *Gaskin*, 2024 WL 1961843, at *3; *Vanco v. J.P. Morgan Chase Bank N.A.*, No. CV ELH-16-3682, 2017 WL 1364757, at *5 (D.Md. Apr. 14, 2017); *Nix v. NASA Fed. Credit Union*, 200 F.Supp.3d 578, 587 (D.Md. 2016); *Anderson v. USAA Fed. Sav. Bank*, No. CA 8:14-1316-TMC, 2013 WL 4776728, at *2–3 (D.S.C. Sept. 4, 2013).

Here, the Chase defendants assert that the facts alleged in the Complaint show that they complied with the EFAA.  In particular, the Complaint indicates the SBA funds were deposited into plaintiff's personal checking account on May 4, 2022, and made available to him that same day.  (Dckt. #90 ¶33).  It was only after the SBA had already deposited the funds that: (a) plaintiff attempted to withdraw the $37,000 of SBA funds from his account with a money order; (b) plaintiff spoke with both Nava and Jacobs regarding his proposed transaction; (c) Jacobs then called the Chase Fraud Center; and (d) Chase placed a freeze on plaintiff's account.  (*Id.* ¶86).  In sum: the Complaint alleges that Chase "plac[ed] a hold on or fr[oze] funds in an account after the deposits [had] been made available" to plaintiff earlier that same day.  *Little Donkey Enters. Wash., Inc.*, 136 Fed.Appx. at 92.  Plaintiff fails to address defendants' argument, let alone point to any authority to allow his EFAA claim to go forward given the allegations within the Complaint.  Accordingly, the Court finds that plaintiff has failed to plead a plausible EFAA claim and that claim must therefore be dismissed.

### C.    The Court Relinquishes Jurisdiction Over Plaintiff's State Law Claims.

With the federal claims dismissed, only plaintiff's state law claims against the defendants remain.  The Seventh Circuit has described a "sensible presumption that if the federal claims

drop out before trial, the district court should relinquish jurisdiction over the state-law claims." *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007). Accordingly, the Court, in its discretion, declines to exercise supplemental jurisdiction over plaintiff's pendent state law claims. *See Carlsbad Tech. Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."); 28 U.S.C. §1367(c)(3). Plaintiff's numerous state law claims against defendants are dismissed without prejudice so that they may be pursued in a state forum. *Doxtator v. O'Brien*, 39 F.4th 852, 867 (7th Cir. 2022) ("Without any federal claims over which it had original jurisdiction, the district court's decision not to exercise supplemental jurisdiction over the pendent state law claims was not an abuse of discretion.").

**D. Plaintiff's Motion for Status and Issuance of a Rule to Show Cause is Denied as Moot.**

Plaintiff also seeks a status conference and oral argument on his motion to dismiss, as well as the issuance of an order to show cause based on his arguments that defendants defrauded this Court by attaching to its motion to dismiss and quoting from a more recent and inapplicable copy of the DAA. (Dckt. #125). In their reply brief, defendants acknowledge that they mistakenly quoted from the more recent version of the DAA but assert that the differences between that version and the version that was in effect on the dates pertinent to this case are immaterial. (Dckt. #110 at 1–3). The Court accepts defendants' explanation that its action in quoting the wrong version of the DAA was a mistake (and not an intentional effort to defraud) and it agrees that the differences between the two versions of the DAA are immaterial insofar as the DAA bears on the resolution of plaintiff's federal claims. (*See* Dckt. #125 at 9–10). Accordingly, the Court denies plaintiff's request for the issuance of an order to show cause.

Finally, the Court denies plaintiff's request for a status conference and oral argument as moot given the determinations made in this ruling.

## CONCLUSION

For the reasons set forth above, Defendants Raul Baduel and Becky Roseland's motion to dismiss plaintiff's Fourth Amended Complaint for lack of personal jurisdiction, (Dckt. #96), is granted. The remaining defendants' motion to dismiss plaintiff's Fourth Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6), (Dckt. #94), is granted with prejudice[8] with respect to plaintiff's federal claims against them, and denied without prejudice as to plaintiff's state law claims. Plaintiff's motion for a status and issuance of a rule to show cause, (Dckt. #125), is denied.

**Date: January 5, 2026**

**Jeffrey I. Cummings**
**United States District Court Judge**

---

[8] The Court in its discretion finds that dismissal with prejudice is appropriate in this case. Plaintiff has had five opportunities to properly allege his federal claims, and, with respect to three of those opportunities, had the benefit of defendants' arguments in favor of dismissal. *Stanard v. Nygren*, 658 F.3d 792, 797 (7th Cir. 2011) (explaining "[w]here the plaintiff fails on his second attempt, the Court has "broad discretion to deny leave to amend" for a number of reasons, including "repeated failure to cure deficiencies.") (cleaned up).